IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2016

## STATE OF TENNESSEE v. DESHUN HAMPTON, MATTHEW TYLER and DEVONTA HAMPTON aka DEVONTA TAYLOR

**Appeal from the Criminal Court for Shelby County**
**Nos. 13-01803, 13-01807, 13-02893, 13-02895, 13-02894  James C. Beasley, Jr., Judge**
_____

**No. W2015-00469-CCA-R3-CD  -  Filed November 23, 2016**
_____

This case represents the consolidated appeals of Defendants Deshun[1] Hampton, Matthew Tyler, and Devonta Hampton.  The three Defendants, having entered open guilty pleas to various felonies, challenge only the trial court's sentencing decisions, including its decision to impose partially consecutive sentences.  The trial court sentenced Mr. Tyler to an aggregate sentence of sixty-six years,[2] Mr. Deshun Hampton to an aggregate sentence of fifty-five years, and Mr. Devonta Hampton to an aggregate sentence of thirty-two years.  Mr. Deshun Hampton and Mr. Tyler, who were between fifteen and sixteen years old at the time of the crimes, assert that their sentences amount to de facto life sentences and are therefore in violation of the Eighth Amendment to the United States Constitution.  They also challenge the application of certain enhancement and mitigating factors.  All three Defendants challenge the trial court's sentencing decisions, asserting that the trial court abused its discretion in imposing partially consecutive sentences.  We conclude that the sentences at issue, while lengthy, allow for a meaningful opportunity for release and do not run afoul of the Eighth Amendment, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

---

[1] Deshun Hampton's first name is spelled in various ways in the record.  The indictment and his statement to police both use the spelling "Deshun."  We note that many of the judgment forms spell his name "Deshuan," and we remand for correction of these forms.

[2] The trial court calculated Mr. Tyler's sentence to be sixty-six years, apparently including in that figure an eleven-year sentence in indictment 13-01802, which is not part of this appeal.

Autumn Chastain, Memphis, Tennessee, for the appellant, Deshun Hampton; Linda Khumalo, Memphis, Tennessee, for the appellant, Matthew Tyler; and Stephen Bush, District Public Defender, and Harry E. Sayle, III, (on appeal), and Michael Johnson (at trial), Assistant District Public Defenders, for the appellant, Devonta Hampton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Thomas Henderson and Jose Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendants came to the attention of law enforcement when Mr. Tyler and Mr. Devonta Hampton committed an aggravated robbery against victim Jose Mateos.[3] The conviction for the aggravated robbery of Mr. Mateos is not at issue in this appeal, but Mr. Mateos nevertheless testified at the sentencing hearing that on January 24, 2013, he was returning home from work when he was approached by two men. He allowed one of the men to use his telephone and that man subsequently pointed a gun at his head and demanded his property and keys. The second assailant then got in Mr. Mateos's truck, and the first assailant attempted to force Mr. Mateos into the truck as well. After a struggle, Mr. Mateos reached the door of his apartment and shouted to his wife to call the police, and the assailants fled.

Mr. Tyler and Mr. Devonta Hampton were arrested in Mr. Mateos's vehicle shortly thereafter. They both acknowledged their role in the crime against Mr. Mateos, Mr. Tyler admitting that he was the gunman and Mr. Devonta Hampton admitting that he was the driver. Both proceeded to give further statements incriminating the three Defendants in numerous other crimes. Mr. Tyler further pointed the police to certain videos on a telephone belonging to him which was in the custody of law enforcement due to a previous arrest. Mr. Deshun Hampton also gave statements to police acknowledging his role in certain crimes.

Ultimately, the three Defendants entered open guilty pleas to numerous crimes, and the Defendants now challenge the trial court's sentencing decisions. Each of the

---

[3] Mr. Mateos's first name is alternatively given as "Yair" in the record. According to an updated presentence report, Mr. Tyler was convicted of the aggravated robbery of Mr. Mateos on September 23, 2014.

three Defendants entered an open guilty plea to one count of aggravated robbery in indictment 13-01803. Mr. Tyler pled guilty to one count of aggravated robbery in indictment 13-01804. Mr. Deshun Hampton and Mr. Tyler also entered open guilty pleas to one count of attempted first degree murder, one count of aggravated assault, and one count of employing a firearm in the commission of a dangerous felony in indictment 13-01807. Mr. Deshun Hampton and Mr. Tyler pled guilty in indictment 13-02893 to one count of animal cruelty and one count of killing an animal. Each of the three Defendants pled guilty to one count of aggravated robbery, one count of aggravated burglary, and one count of employing a firearm in the commission of a dangerous felony in indictment 13-02894; and to two counts of aggravated robbery, one count of aggravated burglary, and one count of employing a firearm in the commission of a dangerous felony in indictment 13-02895.

The criminal activity at issue in this appeal began in May 2012. At the February 5, 2015, sentencing hearing, Officer Fausto Frias of the Memphis Police Department testified that he interviewed Mr. Tyler after Mr. Tyler was apprehended for the robbery of Mr. Mateos and that Mr. Tyler was "bragging about" various other crimes that he had committed, including a shooting that he claimed to have recorded on a cellular telephone which was in the possession of police. Officer Frias found the telephone in the property room and prepared a search warrant. Two relevant videos emerged. One video was footage of the shooting of a dog. The video depicts the assailants walking up to a barking dog which is behind a chain-link fence, shooting the dog with a gun, and running away laughing. Relative to this crime, the State noted at Mr. Tyler's plea hearing that David Sanchez had reported that he kept his pit bull at his business for security purposes and that the dog was shot through the neck sometime between May 22 and May 23, 2012. Based on the video, Mr. Deshun Hampton and Mr. Tyler were each charged in indictment 13-02893 with one count of aggravated animal cruelty and one count of the intentional killing of an animal.

The other relevant video recovered from Mr. Tyler's telephone showed footage of an attempted murder which took place a day or two after the shooting of the dog. At the sentencing hearing, James Giggers, Jr., testified that he was working as an armed security guard in an apartment complex on May 24, 2012. In the early morning hours, Mr. Giggers was sitting in the golf cart he used to patrol the complex when he heard a shot, followed by several more shots. The glass on the passenger's side of his car shattered, and he rolled out of the car. Overall, he heard approximately eight shots, but he could not locate the shooter. Mr. Giggers had glass and shrapnel in his eye from the broken window, and he had to wear an eye patch for approximately one month. The video recovered from Mr. Tyler's telephone shows Mr. Tyler and Mr. Deshun Hampton shooting at Mr. Giggers's car.

-3-

Mr. Tyler's statement detailed the incident, including the name of the videographer. Mr. Tyler stated that he was angry because Mr. Giggers had chased him and a group of youths away from the apartments a few months prior to the shooting. During that incident, he claimed that he and Mr. Deshun Hampton stole an iPad from Mr. Giggers's vehicle while Mr. Giggers chased their friends. Mr. Tyler stated that on the day of the shooting, he and Mr. Deshun Hampton were looking for someone to rob when they saw the security guard. Mr. Tyler stated that he "told [Deshun] that I was fixing to walk past the truck and when the security guard gets out to chase me, I told [Deshun] to shoot him in the face." Mr. Giggers did not get out of the truck when Mr. Tyler walked past. Mr. Tyler and Mr. Deshun Hampton moved across the street and hid behind a wall, and Mr. Tyler shot at Mr. Giggers once, then handed the gun to Mr. Deshun Hampton, who "emptied the clip." The video shows the two young men shooting at the car as described by Mr. Tyler. Mr. Tyler and Mr. Deshun Hampton were each charged with one count of attempted first degree murder, one count of aggravated assault, and one count of employing a firearm in a dangerous felony in indictment 13-01807 as a result of these events.

Shortly thereafter, on June 2, 2012, all three Defendants participated in a home invasion in the same apartment complex. According to the prosecution's presentation of the facts at Mr. Tyler's plea hearing, victims Angelo Lorenzo and Carlos Tercero opened the front door for the assailants and were then robbed at gunpoint of money and telephones. According to Mr. Tyler's statement, the three Defendants and other confederates were "looking for somebody to rob," and looked inside a window in the apartment complex. They saw two men whom they took to be intoxicated. The assailants took the victims' money and telephones. Mr. Tyler stated that both he and one of the Hamptons had a BB gun. Mr. Tyler stated that he and Mr. Deshun Hampton went to the back of the apartment and saw a woman and some children asleep before they were alerted to leave by other participants in the crime, who were watching for the approach of security officers. Mr. Devonta Hampton's statement also noted that there were other participants and that they chose the victims because they looked through the window and thought the victims were intoxicated. Mr. Devonta Hampton stated that Mr. Tyler had a BB gun and that Mr. Deshun Hampton had a .45 caliber pistol. According to Mr. Devonta Hampton, he and Mr. Tyler were the first to enter, and they left after robbing the victims because he saw some other people asleep in the apartment. Mr. Deshun Hampton also acknowledged participating, but he stated that only Mr. Tyler was armed. As a result, the three Defendants were all charged with two counts of aggravated robbery, one count of aggravated burglary, and one count of employing a firearm in the commission of a dangerous felony in indictment 13-02895.

The three Defendants then participated in another home invasion in the same apartment complex. Margaret Bichon testified at the sentencing hearing that she heard a

loud bang on her front door at 1:30 a.m. on July 12, 2012. The men at her door told her that they were police officers, but when she saw that there was no police car in front of her apartment, she called the police. In the meantime, the men forced their way in through the back door. One held her at gunpoint while others went to the bedrooms. The men took her telephone, a laptop computer, and some change. Ms. Bichon was terrified and "just knew [she] was going to get shot." Mr. Tyler's statement was that the three Defendants went to the apartments, where they saw the laptop but did not see anyone through the window. He stated he told the others to pretend to be police, and that he meanwhile broke in the back door. Mr. Tyler held the victim up with a BB gun, and they took a laptop, a telephone, and an orange drink. Mr. Devonta Hampton's statement was that the three Defendants and several accomplices saw the victim alone in the apartment, broke open the back door, and held her at gunpoint. He stated they took the telephone and some change. According to Mr. Deshun Hampton's statement, there were several others youths involved in this crime, and they had seen the victim alone in the home by looking through the window. He stated that she would not open the door and they broke in through the back. According to Mr. Deshun Hampton, Mr. Tyler pointed a BB gun at her and that they took the laptop, a laptop charger, the telephone, and some food. The Defendants were charged with aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony in indictment 13-02894.

The next crime was committed by Mr. Tyler acting alone. According to the prosecutor's statement of facts, on December 19, 2012, police responded to a robbery at the same apartment complex. The victim, Antonio Arguello, stated that a man had approached him with a gun and taken his wallet and sixty dollars. Mr. Tyler acknowledged that he "was walking around looking for somebody to rob," when he saw the victim near the victim's apartment. He pulled out the gun and told the victim to "come on with everything." He took the victim's wallet and ran away. As a result, he was charged with aggravated robbery in indictment 13-01804.

All three Defendants then participated in the aggravated robbery of Luis Ramirez on January 23, 2013. According to Mr. Tyler's statement, he and the Hamptons saw the victim pull up into his apartment complex at around 11:48 p.m., and Mr. Tyler approached him with the black BB gun. The Defendants took the man's money and the keys to his car, which they soon after crashed into a brick wall doing a "donut." Mr. Devonta Hampton's statement was that the three saw the victim pull into his apartment complex and that Mr. Tyler pointed the gun at him while Mr. Deshun Hampton searched his pockets. Mr. Devonta Hampton acknowledged looking through the victim's wallet for gift cards and told police that he then gave the wallet back to the victim. They took the victim's telephone and car, which Mr. Tyler crashed into a brick wall. Mr. Deshun Hampton confirmed in his statement that the three took the victim's telephone, money, and vehicle while Mr. Tyler pointed a weapon. He stated that Mr. Devonta Hampton

-5-

patted down the victim and gave him the victim's keys so that he could drive. As a result of the crime, the Defendants were charged with aggravated robbery in indictment 13-01803.

The Defendants introduced mitigating evidence regarding their troubled childhoods. Michelle Hampton, the mother of Mr. Deshun and Mr. Devonta Hampton, testified on behalf of her children. Ms. Hampton stated that she had six sons and that all of her children were diagnosed with a "mild mental problem" and were "easily influenced." The father of Mr. Deshun and Mr. Devonta Hampton was killed in front of the two boys in 1998. She acknowledged that her children went to juvenile court twice for dependency and neglect, stating that she had gone to jail for three years for attempted second degree murder. During her incarceration, Mr. Deshun Hampton lived with her sister, and Mr. Devonta Hampton lived with her mother. According to Ms. Hampton, Mr. Deshun Hampton had difficulties reading, had learning disabilities, was in resource classes, and suffered from attention deficit hyperactivity disorder. Mr. Devonta Hampton was also in resource class and had been diagnosed with ADHD and bipolar disorder. He had been taking lithium from the age of nine or ten until a little before the commission of the crimes. A psychological evaluation of Mr. Deshun Hampton revealed that he has a borderline IQ of 72 but concluded he was not mentally deficient or mentally ill. Mr. Devonta Hampton was diagnosed in prison with depression and psychosis, including hallucinations. Ms. Hampton acknowledged that she had received warning letters from juvenile court regarding her sons. She acknowledged that Mr. Deshun Hampton and her nephew "broke into a church or something" at eight years old. She testified that Mr. Tyler had stayed with her off and on, that he was "a good boy, too," and that she could not say whether he was the leader in these crimes.

Patricia Rambo, Mr. Tyler's grandmother, testified on behalf of Mr. Tyler. Ms. Rambo stated that Mr. Tyler's father had been a member of a gang and had been abusive to his mother. Mr. Tyler had witnessed this abuse. Mr. Tyler was nevertheless very attached to his father, looked up to him, and tried to emulate him. When Mr. Tyler was six years old, his mother's new boyfriend killed Mr. Tyler's father. Mr. Tyler was "hysterical if you mentioned his father at that time, even at the age of six." The man who had killed his father then moved in with the family, which Ms. Rambo testified was particularly traumatic for Mr. Tyler. Mr. Tyler began running away at age eleven. At one point, Ms. Rambo learned that Mr. Tyler was living with an adult "female impersonator," who went by the name "Peaches." Ms. Rambo contacted the sex crimes unit and was able to find the origin of some telephone calls to determine that "Peaches" had taken Mr. Tyler out of the state. Ms. Rambo believed "Peaches" was prostituting Mr. Tyler, and a police officer had identified certain Craigslist advertisements which police believed were possibly related to Mr. Tyler and "Peaches." In order to separate him from "Peaches," the family gave up custody of Mr. Tyler to the Department of Children's

Services ("DCS"). Mr. Tyler continued to run away from DCS, and Ms. Rambo continued to search for him. At one point, he told her he was staying with the Hamptons. Ms. Rambo stated that Mr. Tyler had expressed remorse about his crimes to her, and that "we recognized they were horrendous also." She acknowledged the existence of a video where "Peaches" is abusing a child and Mr. Tyler is laughing and video recording it.

The Defendants introduced various certificates they had received in prison. Mr. Tyler had a Certificate of Baptism, a Certificate of Recognition for class participation and willingness to excel, a Certificate of Achievement for class participation and willingness to excel, a Certificate of Participation in a 4th of July Education Program, a Certificate of Participation in Hope Academy East, and a Certificate of Completion for the "Moral Reconation Therapy" program. Mr. Deshun Hampton presented a Certificate of Participation in Hope Academy East.

Mr. Tyler addressed the court eloquently, stating that he would like to apologize to the victims "for the pain and scars created by my actions." He stated that he had been a "wild and troubled child" who did not realize how his actions affected others. He told the court that he had not meant to hurt anyone and that he "was ashamed of the person viewed in those videos."

Mr. Tyler and Mr. Deshun Hampton entered guilty pleas to the offenses on October 20, 2014, and Mr. Devonta Hampton entered guilty pleas on November 6, 2014. The trial court took the proof at the sentencing hearing under consideration and announced the sentences on February 9 and 10, 2015. The trial court analyzed each conviction for each Defendant, stating on the record which enhancement and mitigating factors it would apply to each count of each indictment for each Defendant. For each Defendant, the trial court noted that it had considered the relevant statutory considerations and purposes and principles of sentencing.

In sentencing Mr. Tyler, the court noted its concern with the magnitude of the crimes and the manner in which they escalated, and it noted that Mr. Tyler was consistently the participant who was armed during the offenses, either with a BB gun or a .45 caliber weapon. The trial court found that Mr. Tyler was the "main player in all of this." The trial court found that Mr. Tyler was a Range I offender for each crime. It applied as mitigating factors to each of Mr. Tyler's convictions his youth at the time of the offenses and his completion of programs while in prison. *See* T.C.A. § 40-35-113(6), (13). The trial court found that Mr. Tyler was a leader in each offense and that he had a previous history of criminal behavior in addition to that necessary to establish him as a Range I offender. *See* T.C.A. § 40-35-114(1), (2). The trial court also enhanced the animal offenses on the basis that they were committed to gratify a desire for pleasure and involved a firearm, and found that the Defendants had no hesitation about committing a

crime in which the risk to human life was high for the burglary convictions. *See* T.C.A. § 40-35-114(7), (10).  For the burglary and firearms offense committed against Mr. Tecero and Mr. Lorenzo in indictment 13-02895, the trial court also found that there was more than one victim.  *See* T.C.A. § 40-35-114(3).

In sentencing Mr. Deshun Hampton, the trial court found that, for each conviction, he had a history of criminal behavior in addition to that necessary to establish the range based on the offenses at issue.  *See* T.C.A. § 40-35-114(1).  The court found that he was also a leader in indictments 13-01807, 13-02894, and 13-02895.  *See* T.C.A. § 40-35-114(2).  For the burglary and firearms offense committed against Mr. Tecero and Mr. Lorenzo in indictment 13-02895, the trial court also found that there was more than one victim.  *See* T.C.A. § 40-35-114(3).  The trial court enhanced the animal offenses on the basis that they were committed to gratify a desire for pleasure and involved a firearm, and it found that Mr. Deshun Hampton had no hesitation about committing a crime in which the risk to human life was high relative to the burglary convictions.  *See* T.C.A. § 40-35-114(7), (10).  The trial court applied as mitigating factors Mr. Deshun Hampton's youth and his completion of programs in prison.  *See* T.C.A. § 40-35-113(6), (13).

The trial court found that Mr. Devonta Hampton had a history of criminal behavior in addition to that necessary to establish the range for each conviction.  *See* T.C.A. § 40-35-114(1).  The trial court did not find Mr. Devonta Hampton to be a leader in any of the offenses, but it did apply the enhancement factor that Mr. Devonta Hampton had no hesitation in committing a crime in which the risk to human life was high for the burglary offenses.  *See* T.C.A. § 40-35-114 (10).  It found that the burglary offense committed against Mr. Tecero and Mr. Lorenzo in indictment 13-02895 involved more than one victim.  *See* T.C.A. § 40-35-114(3).  It found that Mr. Devonta Hampton's youth and his attempt to complete prison programs were mitigating factors.  *See* T.C.A. § 40-35-113(6), (13).

The trial court imposed sentences as summarized in the following table.

|  | Matthew Tyler | Deshun Hampton | Devonta Hampton |
|---|---|---|---|
| 13-01803 Aggravated robbery | 10 years at 85% (concurrent with all) | 8 years at 85% (concurrent with all) | 8 years at 85% (concurrent with all) |
| 13-01804 Aggravated robbery | 10 years at 85% (concurrent with all) | -- | -- |
| 13-01807 – Count 1 Attempted murder | 15 years | 15 years | -- |

| | | | |
|---|---|---|---|
| 13-01807 – Count 3 Employing a firearm | 6 years at 100% (consecutive to Count 1) | 6 years at 100% (consecutive to Count 1) | -- |
| | | | |
| 13-02893 – Count 1 Animal cruelty | 2 years | 2 years | -- |
| 13-02893 – Count 2 Killing an animal | 2 years (concurrent with Count 1) | 2 years (concurrent with Count 1) | -- |
| | | | |
| 13-02894 – Count 1 Aggravated robbery | 10 years at 85% | 10 years at 85% | 8 years at 85% |
| 13-02894 – Count 2 Aggravated burglary | 10 years | 10 years | 10 years |
| 13-02894 – Count 3 Employing a firearm | 6 years at 100% (consecutive to Count 2) | 6 years at 100% (consecutive to Count 2) | 6 years at 100% (consecutive to Count 2) |
| | | | |
| 13-02895 – Count 1 Aggravated robbery | 10 years at 85% | 10 years at 85% | 8 years at 85% |
| 13-02895 – Count 2 Aggravated robbery | 10 years at 85% | 10 years at 85% | 8 years at 85% |
| 13-02895 – Count 3 Aggravated burglary | 10 years | 10 years | 10 years |
| 13-02895 – Count 4 Employing a firearm | 6 years at 100% (consecutive to Count 2) | 6 years at 100% (consecutive to Count 2) | 6 years at 100% (consecutive to Count 2) |
| | | | |

The trial court found each of the three Defendants to be a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime where the risk to human life was high. *See* T.C.A. § 40-35-115(b)(4). Accordingly, the trial court aligned the sentences to be partially consecutive for all of the Defendants. The weapons offenses were ordered to be served consecutively to the burglary offenses in indictments 13-02894 and 13-02895, as required by law. *See* T.C.A. § 39-17-1324(e)(1). The weapons offense in indictment 13-01807 was to be served consecutively to the attempted murder conviction by law, and the trial court merged the conviction for aggravated assault in this indictment into the attempted murder conviction. *See id.* Otherwise, for each Defendant, the offenses within each indictment were ordered to be served concurrently.

The trial court ordered Mr. Tyler's convictions in indictments 13-01803 and 13-01804 to run concurrently with the other convictions. Otherwise, each indictment under which Mr. Tyler was convicted was to run consecutively. The trial court also ordered these indictments to be served consecutively to another conviction for armed robbery in indictment 13-01802. The trial court calculated the aggregate sentence to be sixty-six years, apparently including the sentence for indictment 13-01802, which Mr. Tyler's presentence report showed to be eleven years.

Mr. Deshun Hampton's convictions were likewise concurrent within each indictment except for the weapons offenses, which ran consecutively as required by statute. *See* T.C.A. § 39-17-1324(e)(1). The trial court ordered Mr. Deshun Hampton's conviction in indictment 13-01803 to run concurrently with all of the other indictments but ordered the other indictments to be served consecutively to one another. Mr. Deshun Hampton's aggregate sentence is fifty-five years.

Mr. Devonta Hampton's convictions were also to be served concurrently within each indictment except as required by law for the weapons offenses. *See* T.C.A. § 39-17-1324(e)(1). Mr. Devonta Hampton's conviction in indictment 13-01803 was also to run concurrently with all other indictments. The other two indictments were ordered to be served consecutively, for an aggregate sentence of thirty-two years.

On appeal, Mr. Tyler challenges the aggregate length of his sentence, asserting that it violates the United States Constitution because it amounts to a life sentence for a juvenile for a nonhomicide offense. Mr. Tyler also asserts that the trial court did not properly apply mitigating factors, particularly his youth and his voluntary confession regarding numerous crimes, and that it misapplied one enhancement factor, the finding that Mr. Tyler was a leader in many of the offenses. Mr. Tyler asserts that the trial court could not rely on the crimes at issue in finding that he had a record of extensive criminal activity to justify consecutive sentencing.

Mr. Deshun Hampton likewise challenges the aggregate length of his sentence as violating federal constitutional principles. He also asserts that the trial court misapplied one of the enhancement factors in the animal offenses.

Mr. Devonta Hampton challenges the trial court's decision to align his convictions in indictments 13-02894 and 13-02895 consecutively. He asserts that the aggregate sentence is not reasonably related to his "social circumstances or the facts of the crimes."

## ANALYSIS

Initially, the State argues that because the record does not contain the plea hearing transcripts for Mr. Deshun and Mr. Devonta Hampton's plea hearings, their sentencing claims are waived. However, the State does not explain how the absence of these records affects our review of sentencing in this case, where the factual bases of all of the offenses were detailed during the sentencing hearing. The record contains the transcripts of the sentencing hearing and the trial court's findings of fact regarding each Defendant. We conclude that the record is adequate for our review.

## I. Eighth Amendment

Mr. Deshun Hampton and Mr. Tyler assert that their aggregate sentences violate the Eighth Amendment of the United States Constitution because they amount to a life sentence with no possibility of release for their nonhomicide offenses. Mr. Deshun Hampton notes that his sentence is fifty-five years, "much of which will be served at eighty-five to one hundred percent," and he asserts it is "essentially a life sentence." Mr. Tyler likewise notes that he was sentenced to serve sixty-six years for non-homicide offenses.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. Courts must consider, under this prohibition, the proportionality of the crime to the punishment. *Kennedy v. Louisiana,* 554 U.S. 407, 419 (2008) *as modified by Kennedy v. Louisiana*, 129 S.Ct. 1 (2008). In *Roper v. Simmons,* 543 U.S. 551 (2005), the United States Supreme Court ruled that punishing juveniles with death violates the Eighth Amendment. *Id.* at 575.

The Defendants premise their Eighth Amendment argument primarily on the United States Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48 (2010). In *Graham*, the Court considered a categorical challenge to a term-of-years sentence: more specifically, whether a punishment of life without the possibility of parole was cruel and unusual punishment for a juvenile convicted of a nonhomicide offense. *Id.* at 61, 63. In determining that such a punishment was not constitutionally permissible, *Graham* noted that "'juvenile offenders cannot with reliability be classified among the worst offenders.'" *Id.* at 68 (quoting *Roper,* 543 U.S. at 569). This is because juveniles have a lack of maturity, underdeveloped sense of responsibility, and are more vulnerable to outside pressures and influences. *Id.* at 68. Juveniles are more capable of change and have brains which have not yet matured in the areas involved in behavior control. *Id. Graham* observed that even expert psychologists have difficulty differentiating between a juvenile who commits a crime as a result of "'transient immaturity'" and one whose criminal behavior is the result of "'irreparable corruption.'" *Id.* (quoting *Roper,* 543 U.S. at 573).

In reaching its decision, *Graham* distinguished between homicide and nonhomicide offenses, noting that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 69. Accordingly, juveniles "who did not kill or intend to kill [have] a twice diminished moral culpability" due to their status as juveniles and the nature of their crimes. *Id.* The Court also compared life without parole to the death sentence, noting that while death is unique in its severity and irrevocability, the two share some characteristics, including a forfeiture that is irrevocable and equates to a "denial of hope." *Id.* at 69-70 (quoting *Naovarath v. State*, 779 P.2d 944, 944 (1989)). The Court was further persuaded by the fact that juvenile offenders would suffer a harsher punishment and longer term under such a sentence than adult offenders would due to the fact that they were imprisoned earlier in life. *Id.* at 70. *Graham* noted that while the State "is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," it must give the defendant "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. The Court concluded that a categorical ban on life without parole sentences for juvenile nonhomicide offenders was appropriate because "a categorical rule gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform." *Id.* at 79.

Continuing its line of cases which distinguish between punishments permissible under the Eighth Amendment for adults and those which are permissible for juveniles, the United States Supreme Court, in *Miller v. Alabama*, 132 S. Ct. 2455 (2012), held that a mandatory sentence of life without parole for juvenile homicide offenders also violates the Eighth Amendment. *Id.* at 2460. The Court reiterated that "children are constitutionally different from adults for purposes of sentencing," being less deserving of the harshest punishments. *Id.* at 2464. The Court stated that a child's "transient rashness, proclivity for risk, and inability to assess consequences" bore upon the child's moral culpability for a crime and also on the child's potential for rehabilitation. *Id.* at 2465. The Court noted that such a mandatory punishment "ignores that [the accused] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." *Id.* at 2468. The Court concluded that, while it did not foreclose the punishment of life without parole for juvenile homicide offenders, it did mandate "a certain process — considering an offender's youth and attendant characteristics — before imposing a particular penalty." *Id.* at 2471. Justices Breyer and Sotomayor, concurring, noted that one of the defendants, who was not the shooter of the victim in his offense, could only be sentenced to life without parole if there was a determination that he killed or intended to kill the victim because "the kinds of homicide that can subject a juvenile offender to life without parole must exclude instances where the juvenile himself neither kills nor intends to kill the victim." *Id.* at 2475-76.

Although the State assumes that the Defendants' plea to attempted first degree murder amounts to a conviction for a homicide crime which removes the case from the ambit of *Graham*, the State cites no authority for this position, and we note that other courts have concluded that attempted murder is not a homicide crime under *Graham*. *See Bramlett v. Hobbs*, 463 S.W.3d 283, 288 (Ark. 2015) (holding that attempted capital murder is not a homicide offense under *Graham*); *People v. Caballero*, 282 P.3d 291, 293 (Cal. 2012) *superseded by statute as stated in People v. Michael X. Bell*, No. B263022, 2016 WL 5462094, at *5 (Cal. Ct. App. Sept. 29, 2016); *People v. Guy V. Lucero*, No. 11CA2030, 2013 WL 1459477, at *1 (Colo. Ct. App. Apr. 11, 2013) *perm. app. granted* (Colo. Dec. 22, 2014); *Gridine v. State*, 175 So. 3d 672, 674 (Fla. 2015), *reh'g denied* (Sept. 24, 2015), *cert. denied,* 136 S. Ct. 1387 (2016) ("[A]ttempted first-degree murder is deemed a nonhomicide offense under Florida law"); *Akins v. State*, 104 So. 3d 1173, 1173-74 (Fla. Dist. Ct. App. 2012); *but see People v. Gipson*, 34 N.E.3d 560, 576 (Ill. App. Ct. 2015), *reh'g denied* (June 22, 2015) ("In the context of the eighth amendment, we seriously question whether attempted murder constitutes a nonhomicide offense."). In making a distinction between homicide and nonhomicide crimes, *Graham* relied on the fact that homicide is irrevocable for the victim, whereas for victims of other serious crimes, "life … is not over and normally is not beyond repair." *Graham*, 560 U.S. at 69 (citation omitted). We conclude that the attempted murder here is best analyzed as a nonhomicide offense under *Graham*.

In this case, the Defendants were not sentenced to life without parole but were instead given separate sentences which were aligned in a partially consecutive manner resulting in an extended term of imprisonment. *Graham* did not address the question of whether an aggregate term-of-years sentence for a series of crimes would violate the Eighth Amendment, and there is a split of authority on the question. The Sixth Circuit denied habeas corpus relief to a juvenile who was sentenced to consecutive, fixed terms exceeding his life expectancy for several non-homicide crimes. *Bunch v. Smith*, 685 F.3d 546, 547 (6th Cir. 2012), *cert. denied sub nom. Bunch v. Bobby,* 133 S.Ct. 1996 (2013). In denying relief, the federal court found that the aggregate sentence was not contrary to clearly established federal law. *Id.* at 551. *Bunch* further noted that *Graham* did not analyze consecutive sentences which might amount to a sentence of life without parole, and it cited to the difficulties of determining what term of years would amount to a life sentence without the possibility of parole, allowing for variations in the offender's life expectancy. *Id.* at 552. The Ninth Circuit, however, came to a different conclusion in *Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013), concluding that the defendant's aggregate sentence for various violent felonies violated the Eighth Amendment because the defendant would never have a meaningful opportunity for release. *Id.* at 1194; *but see Moore v. Biter*, 742 F.3d 917, 920-21 (9th Cir. 2014) (O'Scannlain, J., dissenting from denial of rehearing en banc) (citing cases for the proposition that finding no Eighth Amendment violation was not contrary to clearly established federal law).

-13-

Some courts have held that *Graham* does not apply to aggregate sentences which amount to a sentence of life without parole when aligned consecutively. *See Brian A. Starks v. Joe Easterling*, No. 14-6230, 2016 WL 4437588, at \*3 (6th Cir. Aug. 23, 2016) (concluding that Tennessee's refusal to apply *Graham* to consecutive, fixed-term sentences is not contrary to clearly established federal law); *State v. Kasic,* 265 P.3d 410, 415-16 (Ariz. Ct. App. 2011); *Henry v. State,* 82 So.3d 1084, 1089 (Fla. Ct. App. 2012) *decision quashed by Henry v. State*, 175 So. 3d 675, 680 (Fla. 2015), *cert. denied,* 136 S. Ct. 1455 (Mar. 21, 2016); *State v. Brown,* 118 So.3d 332, 341-42 (La. 2013); *Vasquez v. Com.*, 781 S.E.2d 920, 928 (Va. 2016) ("*Graham* does not apply to aggregate term-of-years sentences involving multiple crimes, and we should not declare that it does."); *see also United States v. Walton,* 537 Fed. App'x 430, 437 (5th Cir. 2013); *People v. Minniti*, No. 2-12-0913, 2015 WL 1828181, at \*4-5 (Ill. App. Ct. Apr. 21, 2015), *perm. app. denied*.

Some courts have come to the opposite conclusion. *See, e.g., Caballero,* 282 P.3d at 294-95; *People v. Rainer,* No. 10CA2414, 2013 WL 1490107, at \*12 (Colo. Ct. App. Apr. 11, 2013) *perm. app. granted* (Colo. Dec. 22, 2014); *Henry*, 175 So. 3d at 680; *State v. Boston*, 363 P.3d 453, 457-58 (Nev. 2015), *as modified* (Jan. 6, 2016) (concluding that *Graham* applies to juvenile offenders with aggregate sentences that are the functional equivalent of a sentence of life without parole); *see also People v. Reyes*, No. 119271, 2016 WL 5239589, at \*2 (Ill. Sept. 22, 2016) (concluding that a mandatory sentence for a homicide and two attempted murders which would require service of eighty-nine years violated *Miller*); *Brown v. State,* 10 N.E.3d 1, 7-8 (Ind. 2014); *State v. Ronquillo*, 361 P.3d 779, 784-85 (Wash. Ct. App. 2015) (concluding that the aggregate nature of the defendant's 51.3-year sentence for four separate crimes including homicide does not protect it from a *Miller* challenge); *State v. Null,* 836 N.W.2d 41, 73 (Iowa 2013); *Bear Cloud v. State*, 334 P.3d 132, 141-42 (Wyo. 2014).

Tennessee has addressed the question of whether a lengthy aggregate sentence for numerous nonhomicide crimes violates the Eighth Amendment. In *State v. Tavaria Merritt*, the juvenile defendant pled guilty to nine counts of rape of a child and was sentenced to nine consecutive terms of twenty-five years. *State v. Tavaria Merritt*, No. M2012-00829-CCA-R3-CD, 2013 WL 6505145, at \*1 (Tenn. Crim. App. Dec. 10, 2013). This court, while acknowledging that the sentence was the equivalent of life imprisonment with no possibility of release, nevertheless concluded that *Graham's* holding applied narrowly to juveniles sentenced to life imprisonment without the possibility of parole for nonhomicide offenses, and implicitly held that aggregate sentences did not fall into this category. *Id.* at \*6. This court nevertheless found the sentence disproportionate and remanded for entry of a sentence of fifty years. *Id.*; *see also Charles Everett Lowe-Kelley v. State*, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at \*8 (Tenn. Crim. App. Feb. 24, 2016), *perm. app. denied* (June 23, 2016)

(concluding that two consecutive sentences of life with the possibility of parole did not violate *Miller*).

Neither the Defendants nor the State has provided any calculations regarding the Defendants' release eligibility, beyond the Defendants' assertion that the sentences amount to life imprisonment without the opportunity for parole. We note initially that while Mr. Tyler challenges the aggregate sentence of sixty-six years, the record does not contain the judgment form for indictment 13-01802, a conviction for aggravated robbery which apparently took place pursuant to a separate trial and sentencing hearing[4] and which accounts for eleven years of the term-of-years sentence. We have only a note in Mr. Tyler's presentence report that he was sentenced to eleven years for this offense and the trial court's oral calculation from the bench of the aggregate sentence to be sixty-six years. This indictment is not part of the appeal before us and the sentence is not under review. Nevertheless, even if we accept Mr. Tyler's contention that this conviction, combined with the sentences on appeal here, resulted in a term of sixty-six years, we conclude that the sentences are not so lengthy as to run afoul the Eighth Amendment.

While Mr. Deshun Hampton notes that much of his aggregate sentence is required to be served at eighty-five or one hundred percent, he neglects to mention that the sentences which have these minimum release eligibility requirements run concurrently within the indictments. Thus, for each burglary-related offense, Mr. Hampton and Mr. Tyler will be serving one six-year sentence at one hundred percent consecutively to a ten-year sentence at thirty percent. The Defendants will have to serve a minimum of nine years on these sentences before they are eligible for parole, and these sentences are concurrent, within each indictment, with the aggravated robberies requiring the service of eighty-five percent of a ten-year sentence, or 8.5 years. By our calculations, Mr. Deshun Hampton will be eligible for parole after serving 29.1 years, and, accepting the premise that Mr. Tyler's aggregate sentence is for the convictions at issue here plus an eleven-year aggravated robbery sentence, Mr. Tyler will be eligible for parole after serving 38.45 years.

These sentences are shorter than sentences that have been held not to amount to a sentence of life without parole under the Eighth Amendment. In *State v. Kayln Marie Polochak*, the defendant argued that her life sentence was unconstitutional because it was a mandatory sentence requiring fifty-one years of service and therefore constituted an effective mandatory sentence of life without parole for a homicide offense under *Miller*. *State v. Kayln Marie Polochak*, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at

---

[4] The prosecutor at the sentencing hearing referred to a trial for this charge, but he also referred to a plea for the same indictment. Mr. Devonta Hampton's counsel stated in his brief that Mr. Devonta Hampton entered a guilty plea for this indictment.

*33-34 (Tenn. Crim. App. Jan. 16, 2015), *perm. app. denied* (Tenn. May 14, 2015). This court rejected the claim that the sentence would violate *Graham* or *Miller*, noting that the defendant, while receiving a mandatory life sentence, would be eligible for parole after serving fifty-one years. *Id.* at *34; *see Billy L. Grooms v. State*, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. Mar. 25, 2015), *perm. app. denied* (Tenn. July 21, 2015), *cert. denied,* 136 S. Ct. 1216 (2016) (concluding that imposition of mandatory life sentences with the possibility of parole to be served concurrently does not violate *Miller*); *Floyd Lee Perry, Jr., v. State*, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014) (dismissing on procedural grounds but noting that the petitioner's sentence of life with the possibility of parole was not the functional equivalent of life without parole); *Tavaria Merritt*, 2013 WL 6505145, at *6 (upholding sentence requiring fifty years of service for a nonhomicide crime); *see also Springer v. Dooley*, No. 3: 15-CV-03008-RAL, 2015 WL 6550876, at *3 (D.S.D. Oct. 28, 2015) (concluding that defendant who would be eligible for parole at the age of forty-nine had meaningful opportunity for release and citing cases); *Guy V. Lucero*, 2013 WL 1459477, at *3 (holding that defendant who would be eligible for release at age fifty-seven did not have a sentence of life without parole); *Andrew R. Ellmaker v. State,* 329 P.3d 1253, at *9 (Kan. Ct. App. 2014) (holding that fifty-year sentence was not the functional equivalent of life without parole); *but see Brian A. Starks*, 2016 WL 4437588, at *4-6 (6th Cir. Aug. 23, 2016) (White, J., concurring) (concluding that release eligibility after fifty-one years of imprisonment does not provide a meaningful opportunity for release under *Miller* and *Graham* but that Tennessee courts' contrary holding was not contrary to or unreasonable application of federal law); *Null*, 836 N.W.2d at 71 (concluding that a 52.5-year sentence was sufficient to trigger *Miller* because the "prospect of a geriatric release" was not a meaningful opportunity to demonstrate rehabilitation and rejecting the notion that "the determination of whether the principles of *Miller* or *Graham* apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates").

Both Mr. Tyler and Mr. Deshun Hampton received credit on their sentences for the time they had spent in jail prior to entry of the judgment, from March 20, 2013 to February 18, 2015. Both Defendants were sixteen years old when they were charged with the offenses and imprisoned. Mr. Deshun Hampton will, by our calculations, be forty-five years old when he is first eligible for parole. Mr. Tyler will be fifty-five. Under *Kayln Marie Polochak*, we conclude that, while these sentences are indeed lengthy, they are not the functional equivalent of a sentence of life without parole. Accordingly, *Graham* does not entitle the Defendants to relief even if we were to construe it to apply to aggregate sentences.

Mr. Deshun Hampton also argues that his consecutive sentences are in any event disproportionate to the crime, given his social circumstances. Mr. Deshun Hampton was convicted of four counts of aggravated robbery, two counts of aggravated burglary, three counts of employing a firearm during the commission of a dangerous felony, attempted murder, animal cruelty, and intentionally killing an animal. He cites no authority for the proposition that his sentence of fifty-five years is grossly disproportionate to these crimes. When a non-capital defendant makes a proportionality challenge, this court must first determine, as a threshold inquiry, whether a comparison of the sentence with the crime leads to "an inference of gross disproportionality." *State v. Harris*, 844 S.W.2d 601, 603 (Tenn. 1992). We conclude that in this case, it does not.

## II. Enhancement and Mitigation

Mr. Tyler and Mr. Deshun Hampton challenge the trial court's decisions regarding the length of their sentences based on the application of certain enhancement and mitigating factors. A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id.* The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by

the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

Here, the trial court specifically noted for each Defendant that it was considering the principles and purposes of sentencing and the factors listed above. The trial court noted that "that the nature of these offenses, the magnitude of these offenses, the manner in which these offenses escalated over a period of time" reaching "a crescendo" of violence was an important consideration in imposing the sentences.

Mr. Tyler asserts that the trial court gave short shrift to the mitigating circumstance of his youth and to the fact that his confessions helped the police to solve numerous unsolved crimes. He also asserts that the trial court erred in finding that he was the leader of the offenses. His brief could also be read to assert that the trial court misapplied the enhancement factor that he had a history of criminal behavior in addition to that necessary to establish the range. We note that Mr. Tyler did not argue to the trial court that the mitigating factor that he "assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses" applied to his crimes. *See* T.C.A. § 40-35-113(9); Tenn. R. App. P. 36(a). Regarding the weight assigned by the trial court to Mr. Tyler's youth, we note that under *Bise*, "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706. The trial court meticulously noted for each conviction that it found Mr. Tyler's youth to be a mitigating factor, and we can discern no error.

In finding that Mr. Tyler's sentences should be enhanced based upon the fact that he was a leader in the commission of offenses involving two or more criminal actors, the trial court noted that the Defendants' statements agreed that Mr. Tyler was the party who was generally armed, and the court found he was the "main player in all of this." *See* T.C.A. § 40-35-114(2). Mr. Tyler's brief asserts that it is impossible to tell from Ms. Bichon's testimony which Defendant was armed, points out that Mr. Deshun Hampton fired the majority of the shots in the attempted murder of Mr. Giggers, and highlights Mr. Tyler's lack of a juvenile record. However, Mr. Tyler's own statements asserted that he was the armed assailant in the offenses against Ms. Bichon, and Mr. Tyler can be heard encouraging Mr. Deshun Hampton to fire in the video recording of the attempted murder of Mr. Giggers. The other two Defendants did not participate in all of the crimes at issue

-18-

as Mr. Tyler did. A trial court need not find that a defendant is the only leader in an offense to apply this factor. *State v. Madden*, 99 S.W.3d 127, 139 (Tenn. Crim. App. 2002) (noting that both of two criminal actors may be a "leader" as the statute does not require the offender to be the sole leader). The trial court found that, in several of the offenses, Mr. Deshun Hampton and Mr. Tyler were both leaders because there was evidence that they were the armed parties and that there were other participants. The trial court did not abuse its discretion in applying this factor.

Mr. Tyler asserts that the trial court could not rely on the instant convictions to establish that he had a "previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). However, "the offenses under review here may also qualify as 'prior criminal history.'" *State v. McKnight*, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994) (holding that enhancement factor was properly applied to a defendant who had single misdemeanor conviction prior to being convicted of forty-six offenses), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 899-900 (Tenn. 2013); *State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) ("Although he has no prior criminal convictions on his record, his criminal behavior because of the multiplicity of counts is a factor."). The trial court correctly applied the enhancement factors. In any event, the trial court imposed sentences in the correct range which reflected a proper consideration of the purposes and principles of sentencing. The trial court found that the offenses were aggravated in that the Defendants were "accosting people in this neighborhood" "for no particular reason," and the trial court expressed concern regarding the escalation in the crimes, which eventually reached "a crescendo of more and more violence." The mere misapplication of an enhancement factor would not invalidate the sentences unless the sentences departed wholly from the Sentencing Act. *Bise*, 380 S.W.3d at 706 (upholding sentences when trial court incorrectly applied the single enhancement factor because other reasons consistent with the purposes of sentencing supported the sentences). The trial court in this case took particular care to distinguish between each individual conviction for each individual Defendant in a complex sentencing hearing. The length of Mr. Tyler's sentences are affirmed.

Mr. Deshun Hampton argues that the trial court incorrectly enhanced the offenses related to the shooting of the dog from one year to two years because it found that the crimes were committed to gratify the Defendants' "desire for pleasure or excitement," a factor which he asserts is already an element of the crime of animal cruelty. *See* T.C.A. § 40-35-114(7). It is an offense to intentionally kill a companion animal "with aggravated cruelty and with no justifiable purpose," and the statute defines aggravated cruelty as "conduct which is done or carried out in a depraved and sadistic manner and which tortures or maims an animal, including the failure to provide food and water to a companion animal resulting in a substantial risk of death or death." T.C.A. § 39-14-

-19-

212(a), (b)(1). Mr. Deshun Hampton cites to an opinion from the Attorney General which concludes that, applying the dictionary definition of "depraved and sadistic," "[i]n order to violate the statute with respect to aggravated cruelty, a person must intentionally torture or maim an animal by engaging in conduct in a morally corrupt or perverted manner or by deriving pleasure or sexual gratification from inflicting pain or cruelty on an animal." Tenn. Op. Atty. Gen. No. 08-124 (July 16, 2008).

Initially, the State correctly notes that this argument was never raised in front of the trial court. It is accordingly waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). In any event, Mr. Deshun Hampton is not entitled to resentencing on his two-year sentence in this conviction, which runs concurrently with the conviction for intentional killing of an animal, *see* T.C.A. § 39-14-205(a)(1)(A). Even if we were to conclude that the trial court misapplied this enhancement factor, the trial court imposed a sentence in the correct range after properly considering the purposes and principles of sentencing. T.C.A. § 39-14-212(d) (classifying the crime as a Class E felony); T.C.A. § 40-35-112(a)(5) (stating that a Range I sentence for a Class E felony is not less than one nor more than two years). The trial court correctly applied other enhancement factors to this particular crime, including Mr. Deshun Hampton's previous history of criminal behavior in addition to that necessary to establish the range and the use of a firearm. *See* T.C.A. § 40-35-114(1), (9). Because "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the Sentencing Act, and because the sentence in this case was supported by "other reasons consistent with the purposes and principles of sentencing as provided by statute," we conclude that the trial court did not abuse its discretion in imposing a two-year sentence, rather than the minimum sentence of one year, for this crime. *Bise*, 380 S.W.3d at 706. Accordingly, we affirm the trial court's decisions regarding the length of Mr. Deshun Hampton's sentences.

### III. Consecutive Sentencing

As noted above, a trial court's sentencing decisions are generally reviewed for abuse of discretion. *Bise*, 380 S.W.3d at 707. Likewise, the "standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of the seven statutory bases for imposing consecutive sentences delineated in Tennessee Code Annotated section 40-35-115(b). *Id.* at 861. The trial court may properly impose a consecutive sentence upon the finding of just one of the criteria listed above. *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013). Tennessee

Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is an offender whose record of criminal activity is extensive" or when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(2), (4). Because the criterion that the defendant is a dangerous offender is "the most subjective and hardest to apply," this category requires additional findings in order to support consecutive sentencing. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). When the trial court bases its decision to run sentences consecutively on the dangerous offender category in Tennessee Code Annotated section 40-35-115(b)(4), it must make additional findings as set out in *State v. Wilkerson*: that the aggregate sentence is "*reasonably related to the severity of the offenses*" and "*necessary in order to protect the public from further criminal acts by the offender.*" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)) (emphasis provided in *Pollard*). If the trial court fails to make the requisite findings, the appellate court may either conduct a de novo review to determine whether there is an adequate basis for the imposition of consecutive sentences or remand to the trial court so that it may consider the appropriate factors and make the proper findings. *Pollard*, 432 S.W.3d at 864.

Mr. Devonta Hampton asserts that the trial court erred in ordering some of his sentences to be served consecutively because the aggregate sentence was not reasonably related to the crimes. Mr. Tyler challenges consecutive sentencing on the basis that the trial court could not rely on the offenses to which he was simultaneously pleading guilty to establish that he had a record of criminal activity that was extensive. Mr. Tyler also asserts that the trial court failed to make the requisite finding that the aggregate sentence was reasonably related to the offenses.

In imposing partially consecutive sentences on Mr. Devonta Hampton, the trial court found that he did not have an extensive record of criminal activity. Instead, it relied solely on the dangerous offender category. The trial court found that he was "a dangerous offender whose behavior indicates little or no regard for human life" and that he had "no hesitation about committing a crime in which the risk to human life is high." The court noted that the burglary crimes which were run consecutively were "aggravated" in that the Defendants were looking in windows searching for victims, were armed, intimidated the inhabitants, and demonstrated a "depraved" attitude. The court found that confinement for an extended period would be necessary to protect society from Mr. Devonta Hampton's unwillingness to lead a productive life and his resort to criminal activity. It found that the aggregate length of the sentence was reasonably related to the offenses. The Defendants committed numerous violent crimes over the course of several months. While Mr. Devonta Hampton disagrees with the trial court's conclusion regarding the aggregate length of the sentence, he has not shown that the trial

court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence. *See Herron*, 461 S.W.3d at 904. Accordingly, we affirm the trial court's decision to impose partially consecutive sentences.

The trial court considered the prosecution's argument that Mr. Tyler's sentences could be imposed consecutively due to an extensive record of criminal activity. *See* T.C.A. § 40-35-115(b)(2). The courts ruling from the bench was ambiguous:

> I do find that this series of events very well could qualify and needs to be reviewed. I feel that under the law it could be applicable but I'm not sure that that's the way this particular sentence is to be considered and imposed. If I'm incorrect, I'm sure they can tell me.

However, the trial court's completion of the "Sentencing Findings of Fact" form clarifies that the trial court did not apply this factor.[5] Instead, it relied on the finding that Mr. Tyler was a dangerous offender. *See* T.C.A. § 40-35-115(b)(4). The trial court may properly impose a consecutive sentence upon the finding of only one of the criteria listed in Tennessee Code Annotated section 40-35-115(b). *Dickson*, 413 S.W.3d at 748. In finding that Mr. Tyler was a dangerous offender, the court noted that his behavior indicated little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high. The trial court found that the crimes were committed under aggravated circumstances. The trial court noted that the crimes escalated, and that Mr. Tyler was with a large group of youths walking through the apartment complex, "looking for people to rob," that he was armed, and that the offenders were forcing their way into residences which they knew were occupied in order to accost the residents. The trial court noted that Mr. Tyler shot at Mr. Giggers with a .45 caliber weapon "just because the man had done his job," and it found that the shooting of the dog was committed out of "sheer … excitement." The trial court found that

---

[5] We note nevertheless that in finding a defendant to be an offender whose record of criminal activity is extensive, the trial court is not limited to prior convictions. In *State v. Cummings*, the defendant had no criminal history at all prior to pleading guilty to eight counts of fraudulently obtaining a controlled substance, crimes which took place over a period of months. *State v. Cummings*, 868 S.W.2d 661, 662, 667 (Tenn. Crim. App. 1992). This court upheld consecutive sentencing based on a finding of extensive criminal activity. *Id.* at 667; *see also In re Sneed*, 302 S.W.3d 825, 829 (Tenn. 2010) (upholding consecutive service of contempt convictions based on extensive criminal record due to the "flagrant nature" and "sheer number" of fifty separate acts of criminal contempt which were simultaneously adjudicated and also concluding consecutive sentencing was justified because the sentences were for criminal contempt). The trial court accordingly could properly have considered Mr. Tyler's thirteen separate convictions for various violent felonies in finding that his record of criminal activity was extensive.

confinement for an extended period of time was necessary to protect society from Mr. Tyler's unwillingness to lead a productive life and his resort to criminal activity in furtherance of his anti-societal lifestyle.  Contrary to Mr. Tyler's assertion, the trial court then specifically found that the aggregate length of the sentence was reasonably related to the offenses, considering the multiplicity of the charges.  We conclude that the trial court did not abuse its discretion in finding Mr. Tyler to be a dangerous offender.  The trial court's finding of just one of the factors listed in Tennessee Code Annotated section 40-35-115(b) is sufficient to support consecutive sentencing.  We cannot conclude that the trial court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence.  *See Herron*, 461 S.W.3d at 904.  The trial court did not abuse its discretion in ordering Mr. Tyler's sentences to be run partially consecutively to one another.

## CONCLUSION

We affirm the trial court's judgments regarding the length of the Defendants' sentences and the trial court's decision to impose partially consecutive sentences on each Defendant.  We remand for the correction of the spelling of Mr. Deshun Hampton's name on those judgment forms which spell his name "Deshuan."  We also note that some of the judgment forms reflect other errors.  For instance, the judgment form for Mr. Tyler in Case 13-01804 notes that the single count is to run concurrently with itself and does not indicate whether it should be served concurrently with indictment 13-01803.  The judgment forms for Mr. Tyler in indictment 13-02895 list indictment 13-02895 as a sentence to be served consecutively, and the same is true for the judgment forms for Mr. Deshun Hampton in indictment 13-02893.  The judgment forms for Mr. Devonta Hampton in indictment 13-02894 state that the sentence is to be served consecutively to the sentence in indictment 13-02985 rather than indictment 13-02895.  We remand for any corrections necessary on the judgment forms.

_____
JOHN EVERETT WILLIAMS, JUDGE

-23-